UNITED STATES DISTRICT COURT         *JUDGE SULLIVAN*
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

ANCHORAGE CAPITAL GROUP, L.L.C.,

                              Plaintiff,

          - against -

BNP PARIBAS SA,

                              Defendant.

-------------------------------------------------------------X

**13 CIV 2731**

Removed from:

Supreme Court of the State of
New York, County of New York

Index No. 650851/2013

APR 24 2013
U.S.D.C. S.D.N.Y.
CASHIERS

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that pursuant to 28 U.S.C. §§ 1332, 1441 and 1446 and

Local Civil Rule 81.1, defendant BNP PARIBAS ("BNPP"),[1] through the undersigned counsel,

hereby removes the above-captioned action, filed in the Supreme Court of the State of New

York, New York County, to the United States District Court for the Southern District of New

York.  In filing this Notice of Removal, BNPP does not waive and expressly reserves any and all

rights and defenses it may have, including the right to move to dismiss on the grounds of lack of

personal jurisdiction, forum non conveniens, and/or improper venue.

In support of this Notice of Removal, BNPP respectfully states as follows:

## BACKGROUND

1.       On March 11, 2013, plaintiff Anchorage Capital Group, L.L.C.

("Anchorage"), filed a Summons and Complaint, captioned Anchorage Capital Group, L.L.C. v.

BNP Paribas SA in the Supreme Court of the State of New York, New York County, under

---

[1]      Plaintiff's complaint erroneously names "BNP Paribas SA" in the caption.  The name of the
entity to which Plaintiff delivered its complaint is "BNP Paribas."

Index No. 650851/2013 (the "State Court Action").  A copy of the Summons and Complaint, and corresponding Affidavit of Service, is attached hereto as Exhibit A.

2.      The Southern District of New York is the district and division in which the Supreme Court of the State of New York, New York County is located and in which this action is pending.  See 28 U.S.C. §§ 112(b), 1441(a), 1446(a).

3.      Anchorage delivered a copy of the Summons and Complaint to BNPP in Paris, France on or about March 25, 2013.

4.      On April 4, 2013, Anchorage filed an amended complaint in the State Court Action (the "Amended Complaint").  A copy of the Amended Complaint is attached hereto as Exhibit B.

5.      On April 19, 2013, BNPP accepted service of the Amended Complaint in return for, among other things, Anchorage's agreement to provide BNPP with sixty (60) days to answer, move to dismiss, or otherwise respond to the Amended Complaint.

6.      This Notice of Removal is filed within thirty days after receipt by BNPP of the Summons and Complaint and is therefore timely filed under 28 U.S.C. § 1446(b).

7.      BNPP has not pleaded, answered, or otherwise appeared in the State Court Action.

8.      Pursuant to 28 U.S.C. § 1446(d), the undersigned counsel for BNPP will promptly give Anchorage written notice of the filing of this Notice of Removal and will promptly file a copy of this Notice of Removal with the Clerk of the Supreme Court of the State of New York, New York County.

9.      This Notice of Removal is signed pursuant to Federal Rule of Civil Procedure 11.

2

10.     BNPP reserves the right to file a supplemental statement in support of its right to have federal jurisdiction maintained over the claims asserted against it.

## GROUNDS FOR REMOVAL

11.     Pursuant to 28 U.S.C. § 1441(a), removal is proper for "any civil action brought in a State court of which the district courts of the United States have original jurisdiction."  This Court has original jurisdiction over this action based on diversity of citizenship because, as discussed below, "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a).

### Amount in Controversy

12.     In the State Court Action, Anchorage seeks an order declaring invalid two agreements whereby it promised to purchase from BNPP an aggregate of $95 million in face value of notes at a price of 62.5 cents on the dollar, for total consideration of $59,375,000.  (See Ex. A ¶ 24 (describing agreements "to purchase an aggregate face value of $95 million of the Notes at a price of 62.5 cents on the dollar"); Ex. B ¶ 25 (same); Ex. A ¶ 44 (seeking an order declaring the contracts "reached between Anchorage and BNP . . . [are] not a firm, binding, irrevocable agreement by Anchorage to purchase the Notes"); Ex. B ¶ 47 (same)).

13.     Because the value of the contracts that Anchorage seeks to avoid through its declaratory judgment action is $59,375,000, the amount in controversy in this case far exceeds the statutory amount of $75,000, as required by 28 U.S.C. § 1332(a).  See 28 U.S.C. § 1446(c)(2); Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 342 (1977); Beacon Constr. Co. v. Matco Elec. Co., 521 F.2d 392, 399 (2d Cir. 1975); Grabala v. Global Tower LLC, No. 09 Civ. 2082 (SCR), 2009 WL 1403931, at *3 (S.D.N.Y. May 19, 2009).

14.    Furthermore, in the Amended Complaint, Anchorage advances claims for the recovery of "significant" monetary damages on the basis that BNPP allegedly (1) breached its obligation to negotiate in good faith and (2) breached the contracts between the parties. (Ex. B ¶¶ 54, 60.)

15.    As Anchorage's breach claims relate to its purchase of $59,375,000 in Notes, which Anchorage avers "are now virtually worthless" (Ex. B ¶ 39), the amount in controversy clearly exceeds the statutory amount of $75,000.

### Diversity of Citizenship:  Matter is Between Citizens of a State and Citizens or Subjects of a Foreign State

16.    Upon information and belief, Anchorage is a Delaware limited liability company with its principal place of business in New York, New York. (Ex. A ¶ 12; Ex. B ¶ 13.) BNPP has no basis to believe that any of Anchorage's members is a citizen of a foreign state. Pursuant to Local Civil Rule 81.1, Anchorage shall, within 21 days after removal, file in the office of the Clerk a statement setting forth the identities and citizenships of its members.

17.    BNPP is a French *société anonyme* with its headquarters and principal place of business in Paris, France.  Thus, BNPP is a citizen of a foreign state.  28 U.S.C. § 1332(c).

18.    As BNPP is a citizen of a foreign state and is not a citizen of the same State as Anchorage, there is complete diversity among the parties to this action.  28 U.S.C. § 1332(a).

19.    Removal on the basis of diversity of citizenship is not precluded by the provisions of 28 U.S.C. § 1441(b)(2) because BNPP is not a citizen of the State of New York, the State in which this action was brought.

4

## CONCLUSION

20.     This Court has original jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332 and this action may be removed to this Court pursuant to 28 U.S.C. §§ 1441 and 1446.

Dated: New York, New York
       April 24, 2013

                              CLEARY GOTTLIEB STEEN & HAMILTON LLP


                              By: _____


                              Breon S. Peace
                              Ari D. MacKinnon
                              One Liberty Plaza
                              New York, New York 10006
                              Tel.: (212) 225-2000
                              Fax: (212) 225-3999

                              *Attorneys for Defendant BNP Paribas*

# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

------------------------------------------------------- X

ANCHORAGE CAPITAL GROUP, L.L.C.         :         Index No. _____/13

                **Plaintiff,**         :

                              :

       - against -         :         **SUMMONS**

BNP PARIBAS SA,         :

                              :         Date Index No.

            **Defendant.**         :         Purchased: **March 11, 2013**

------------------------------------------------------- X

To the above-named Defendant:

        BNP Paribas SA
        16 Blvd. des Italiens
        Paris, France 75009

        You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

        The basis of venue is CPLR § 503(a); plaintiff's residence is at 610 Broadway, 6th floor, New York, NY 10012.

Provided by CourtAlert                                                  www.CourtAlert.com

Dated:     March 11, 2013        ROBBINS, RUSSELL, ENGLERT, ORSECK,
           Washington, D.C.        UNTEREINER & SAUBER LLP

By: _____

Lawrence S. Robbins
Kathryn S. Zecca
Ariel N. Lavinbuk
Donald Burke

1801 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
lrobbins@robbinsrussell.com

*and*

Andrew A. Wittenstein
FRIEDMAN & WITTENSTEIN
A Professional Corporation
600 Lexington Avenue
New York, NY 10022
Tel: (212) 750-8700
Fax: (212) 223-8391
awittenstein@friedmanwittenstein.com

*Attorneys for Plaintiff*

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------

ANCHORAGE CAPITAL GROUP, L.L.C.    X    Index No. _____/13

        **Plaintiff,**    :

             :

   **- against -**       :    <u>COMPLAINT</u>

             :

**BNP PARIBAS SA,**       :

             :

       **Defendant.**    :

------------------------------------------------------------------ X

Plaintiff Anchorage Capital Group, L.L.C. ("Anchorage"), through its attorneys, for its Complaint against Defendant BNP Paribas SA ("BNP") states as follows:

<u><strong>SUMMARY OF THE ACTION</strong></u>

1.   This action arises from BNP's attempt to force Anchorage to close a transaction that it never agreed to close—and one that, because of BNP's protracted and inexcusable delay, now cannot close on the terms contemplated by the parties.

2.   In early December 2012, Anchorage and BNP discussed a proposed sale of $95 million in face value of subordinated private placement notes ("the Notes") issued by Anglo Irish Bank Corporation PLC ("Anglo Irish"), an Irish commercial bank that was nationalized in 2009. Over the course of multiple telephone calls, the parties reached an understanding with respect to the price Anchorage was willing to pay BNP for the Notes. The parties did not, however, reach agreement on other material terms, including what representations and warranties the parties would make to one another in connection with the contemplated purchase.

3.   Almost immediately after these telephone calls, Anchorage sought to negotiate a formal written agreement. Such documentation is customary in the industry. Accordingly, Anchorage sent BNP a draft trade acknowledgment that contained

Provided by CourtAlert                     www.CourtAlert.com

representations and warranties that each party would need to make prior to closing.  BNP did not dispute the need to negotiate and execute this further documentation.  Indeed, BNP assured Anchorage that it would circulate the proposed documentation to the appropriate BNP departments and would reply in due course.  But rather than negotiate the outstanding terms of the transaction and complete the necessary documentation, BNP began a pattern of delay.

4.      Although private-placement note transactions typically close in a matter of weeks, BNP made *no* substantive communications regarding the transaction for almost a month.  When BNP finally broke its silence, it explained for the first time that it could not get the Notes from their current owner because the Notes had been destroyed months earlier in Hurricane Sandy.  BNP provided no timeline for when it would be prepared to proceed with the contemplated transaction.

5.      As the weeks stretched on, Anchorage continued to press BNP to proceed with the contemplated transaction and to provide comments on the draft trade acknowledgment that Anchorage had sent BNP.  But BNP continued to delay.  On February 5, 2013, BNP advised that it was still awaiting re-issuance of the destroyed Notes and that it could not provide an "ETA" with respect to that process.  That same day, during a telephone conversation with Anchorage personnel, BNP's trader explained that he was reluctant to expedite the closing process because he was due to be paid a bonus in two weeks and did not wish to raise Anchorage's concerns with his superiors before he was paid.

6.      In the early morning hours of February 7, 2013, the Irish parliament passed emergency legislation to liquidate Anglo Irish, legislation that rendered the Notes virtually worthless.  Thus, as a consequence of BNP's delay in pursuing the transaction, Anchorage

2

was deprived of any opportunity to sell the Notes to another purchaser—an option Anchorage had contemplated at the time of the parties' initial negotiations and again during the intervening months.

7.      Immediately following the announcement of Anglo Irish's liquidation, BNP's behavior abruptly turned.  Whereas BNP previously had maintained that it was unable to provide any timeline for closing the transaction, on the day that Anglo Irish's liquidation was announced BNP informed Anchorage that it had had made "progress" with its upstream seller.  Later that week BNP proclaimed that it had suddenly found a way to close the transaction in but a single day.

8.      Because of BNP's delay, it is now far from clear how the negotiations necessary to consummate the contemplated transaction could have any realistic chance of success.  In the draft trade acknowledgment that Anchorage sent to BNP following the parties' telephone conversations about price, Anchorage requested from BNP a representation that as of the time of settlement "[t]here are no . . . events which . . . would be defaults pursuant to the Note Purchase Agreement" that governs the Notes.  Under the terms of the Note Purchase Agreement, the appointment of a liquidator for Anglo Irish constitutes a default, and so BNP cannot now make the representation that Anchorage requested nearly two months before the liquidator was appointed.

9.      In any case, BNP never negotiated the outstanding terms and written documentation that, as a matter of industry practice, would be required to consummate the contemplated transaction—documentation that Anchorage had said was required and which BNP had never stated was unnecessary.  Instead, BNP issued a series of ultimatums in which it threatened to initiate legal action if Anchorage did not immediately pay BNP for the

3

Notes.  Ultimately, BNP filed suit against Anchorage in the United Kingdom on February 19, 2013.  To date, Anchorage has not been served with a copy of BNP's filing in the UK action.

10.     Because the parties have not reached agreement on open material terms and on the formal documentation that would be necessary to consummate the contemplated transaction, Anchorage is not under any obligation to close the transaction and purchase the Notes at this time.  Nonetheless, BNP continues to assert that Anchorage is obliged to purchase the Notes and pay BNP immediately.

11.     Accordingly, in light of the real and immediate controversy between Anchorage and BNP, Anchorage seeks a declaration (i) that the parties' oral understanding does not bind Anchorage to purchase the Notes; (ii) that because the parties have not reached agreement on open material terms and on the formal documentation that would be necessary to consummate the contemplated transaction, Anchorage is not at this time obliged to purchase the Notes; and (iii) that in any event, BNP did not perform its obligations under any contemplated transaction prior to the announcement of Anglo Irish's liquidation, a delay which materially frustrated the transaction and rendered void any putative contract between the parties.

## PARTIES

12.     Plaintiff Anchorage Capital Group, L.L.C. is a Delaware limited liability company with its principal place of business at 610 Broadway, 6th Floor, New York, New York.

13.     Upon information and belief, Defendant BNP Paribas SA is a French *société anonyme* with its principal place of business in Paris, France.

Provided by CourtAlert                                                                                      www.CourtAlert.com

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction over this action pursuant to CPLR §§ 301, 302, and 3001.  BNP has offices and regularly transacts business within the State, and it participated in negotiations and other activities within the State that led to the contemplated transaction that gave rise to Anchorage's claim for declaratory relief in this complaint.

15.     Venue is proper in this Court pursuant to CPLR § 503(a).

## BACKGROUND

16.     In mid-November 2012, BNP asked Anchorage if it was interested in purchasing some portion of the Notes.  BNP's inquiry was referred to a New-York based Anchorage trader, who took the lead in negotiating a possible transaction.  Over the next few weeks, Anchorage and BNP had a series of communications in which BNP conveyed to Anchorage information regarding the Notes and the parties discussed the volume of Notes that Anchorage might purchase and at what price.

17.     Among the information conveyed by BNP to Anchorage was that although Anglo Irish had been nationalized by the government of Ireland in January 2009, Anglo Irish had not missed any payments due under the Notes.

18.     BNP further explained to Anchorage that the Notes were embodied in physical certificates, and that, pursuant to the Note Purchase Agreement, transfer of the Notes could be accomplished only by re-registering those certificates with Anglo Irish itself. Anchorage also understood that BNP did not yet own the Notes it was seeking to sell; rather, the Notes were owned by an "upstream" seller, Fir Tree Capital ("Fir Tree"), another New-York-based firm.  In effect, BNP was serving as a broker between a seller and a purchaser that were both located in New York.  Although Anchorage was aware that Fir Tree owned

5

the Notes, Anchorage did not have any reason to suspect that Fir Tree lacked physical control of the certificates—a fact that would not emerge until several weeks later.

19.     During Anchorage's negotiations and discussions with BNP, BNP also emphasized that, pursuant to the Note Purchase Agreement, the Notes are governed by New York law.   This fact was important to Anchorage because, following Anglo Irish's nationalization in 2009, Anglo Irish had forced holders of other notes governed by Irish law to exchange those notes for less than face value, but had not done the same with respect to notes governed by New York law.

20.     Consistent with the Notes being governed by New York law, the Note Purchase Agreement provided that any legal action or proceeding arising out of the Note Purchase Agreement or the Notes themselves may be brought in the New York state courts or in the United States District Court for the Southern District of New York.   Additionally, all payments due under the Notes were to be denominated in United States Dollars and made in New York City.

21.     The connection between New York and the contemplated transaction is reinforced by the fact that the Notes themselves were and, upon information and belief, still remain in New York.   As BNP would ultimately inform Anchorage, the certificates evidencing the Notes were destroyed in flooding caused by Hurricane Sandy at a Depository Trust Company facility in New York.

22.     While evaluating whether to purchase the Notes, Anchorage investigated the possibility of re-selling the bonds, at a profit, back to Anglo Irish itself, and Anchorage communicated with an Anglo Irish official about this possibility.   Although the official

6

appeared receptive to such a transaction, Anchorage was unable to pursue the matter further because it did not have possession of the Notes.

23. On December 7, 2012, Anchorage's trader, acting from New York, reached an oral understanding with BNP's trader that Anchorage would be willing to purchase $50 million in face value of the Notes, at a price of 62.5 cents on the dollar. The parties also reached an understanding that Anchorage would have an option on an additional $45 million in face value until the following Monday, December 10, 2012.

24. On December 10, 2012, an Anchorage trader based in London informed BNP that Anchorage would be willing to purchase the additional $45 million in face value of the Notes previously negotiated by Anchorage's New-York-based trader. Thus, between December 7 and December 10, the parties reached an oral understanding that Anchorage would be willing to purchase an aggregate face value of $95 million of the Notes at a price of 62.5 cents on the dollar.

25. Upon information and belief, during the course of negotiations regarding the Notes, Anchorage's trader expressly told BNP's trader that any proposed transaction was subject to documentation.

26. In any event, it is customary in the industry that any transaction involving a sale of private placement notes would be documented with one or more formal, written agreements between the parties to the sale. There is no standardized form or structure for such agreements. Instead, the parties to a sale of private placement notes generally negotiate the required agreements on a case-by-case basis. Such agreements typically contain a series of representations and warranties by both the seller and the buyer.

7

27.     In accordance with this industry practice, Anchorage promptly contacted BNP to begin the process of negotiating the documentation necessary to consummate the transaction.  On December 11, 2012, Anchorage sent BNP an email message in which it outlined potential options for settlement of the transaction and explained that, to complete the transaction, it would need confirmation documents and transfer documentation as outlined in the Note Purchase Agreement.

28.     BNP did not respond to Anchorage's email on December 11.  The next day, December 12, 2012, Anchorage sent another email message requesting a response.  Later that day, BNP responded via email.  It explained that the Notes took the form of physical certificates and that it would take some time to re-register the Notes from Fir Tree to BNP. BNP estimated that the process would take four weeks.  At no point in its email did BNP suggest that further documentation would not be required to consummate the contemplated transaction.

29.     On December 14, 2012, Anchorage sent BNP a draft trade acknowledgment and requested that BNP provide comments on the draft.  Among the terms included in the draft trade acknowledgment was a representation by BNP that, as of the time of settlement, "[t]here are no undeferred, or unwaived defaults, or events which with the giving of notice or passage of time or both would be defaults pursuant to the Note Purchase Agreement."  In addition, the draft trade acknowledgment included a term (to which BNP has never objected) providing that the parties' agreement would be governed by New York law.

30.     On December 17, 2012, BNP responded to Anchorage's email message, stating that Anchorage's communication had been passed on to BNP's compliance/legal department and that BNP would reply in due course.  Once again, BNP's email did not

8

suggest that further documentation was unnecessary to consummate the contemplated transaction.

31.    But BNP never replied with comments on Anchorage's proposed trade acknowledgment.  On January 4, 2013, Anchorage again contacted BNP, asking for a status update.  Later that day, BNP told Anchorage that it was still awaiting re-registration from Fir Tree and explained, for the first time, that the delay in this process was because the physical certificates for the Notes had been destroyed several months earlier by flooding during Hurricane Sandy.  Anchorage stated that, while waiting for Anglo Irish to issue new certificates to replace the destroyed ones, the parties should negotiate the terms of the documentation necessary to consummate the contemplated transaction.  Anchorage also asked that BNP indicate when it would provide comments on the draft trade acknowledgment that had been proposed to BNP almost one month before.  BNP did not respond to this question, nor did it suggest in any way that further documentation was unnecessary to consummate the contemplated transaction.

32.    Anchorage sought further status updates from BNP on January 15 and January 16, 2013, but BNP did not provide comments on the draft trade acknowledgment.

33.    In mid-January 2013, Anchorage spoke by telephone with Fir Tree personnel in New York about the possibility of Anchorage stepping into Fir Tree's shoes in litigation that Fir Tree had brought against Anglo Irish.  Spurred by this development, Anchorage again considered the possibility of selling the Notes back to Anglo Irish at a profit. But again Anchorage was unable to pursue such a strategy because it did not have possession of the Notes.

9

34.    On February 4, 2013, Anchorage sought yet another status update from BNP. BNP responded on February 5, stating that BNP was *still* waiting for the physical certificates to be reissued by Anglo Irish and that there was no "ETA" on completion of the process. Once again, BNP did not suggest in any way that further documentation was unnecessary to consummate the contemplated transaction.

35.    Also on February 5, Anchorage's trader and two of its analysts contacted BNP's trader to express their frustration with the delay in consummating the contemplated transaction. BNP's trader asked to delay the conversation, explaining that he was due to be paid a bonus in two weeks—a bonus he said he did not want to jeopardize by raising Anchorage's concerns with his superiors. Anchorage stated that this was unacceptable, and BNP's trader ultimately proposed that the parties use an escrow arrangement to consummate the transaction. Anchorage rejected that option because it would not have allowed Anchorage to control the physical certificates at settlement.

36.    Control of the physical certificates was important to Anchorage for several reasons. *First*, it would assure that, when Anchorage paid for the Notes, it would indeed have title to them. *Second*, the ability to produce the physical certificates might be necessary to collect on the Notes in the event of a coercive restructuring of the Anglo Irish debt. *Third*, as a practical matter, Anchorage would need control over the physical certificates if it were to pursue the option of selling the Notes to another purchaser, including the option of selling the Notes back to Anglo Irish itself.

37.    During the evening of February 6, 2013, the Irish parliament held a late-night parliamentary session to consider emergency legislation to liquidate Anglo Irish, which liquidation was proposed by the Irish government as part of negotiations with the European

10

Central Bank. The legislation was passed in the early morning hours of February 7, 2013. Under the terms of the legislation, the board of Anglo Irish was immediately discharged and replaced by the accounting firm KPMG, which would serve as liquidator for the company.

38.     As a result of the Irish government's liquidation plan, the Notes are now virtually worthless. BNP's inexcusable delay in consummating the contemplated transaction has therefore deprived Anchorage of any opportunity to re-sell the Notes at a profit, including the option, which Anchorage had specifically contemplated, of re-selling the Notes back to Anglo Irish.

39.     The appointment of a liquidator for Anglo Irish constitutes a default under the Note Purchase Agreements. As a consequence, if the contemplated transaction were to be consummated, BNP would be unable to make the representation proposed in Anchorage's draft trade acknowledgment that, at the time of settlement, "[t]here are no undeferred, or unwaived defaults, or events which with the giving of notice or passage of time or both would be defaults pursuant to the Note Purchase Agreement."

40.     Later on February 7, 2013, just hours after the announcement of Anglo Irish's liquidation, BNP emailed Anchorage and reported that—notwithstanding BNP's inability to provide even an estimated ETA just a few days before—"[w]e have had some progress from our Seller." In its email, BNP asked Anchorage to provide its full legal name for listing on the certificates. On February 11, 2013, BNP again emailed Anchorage, stating that it was in discussions with Anglo Irish to reduce the period of re-registration to a single day.

41.     On February 14, 2013, BNP sent an email to Anchorage stating that it had been in contact with Anglo Irish and that it expected to be able to settle the contemplated transaction and would require payment in the next few days. Later that same day, BNP sent

11

an email to Anchorage, attaching new certificates that reflected transfer of the Notes to the names of funds managed by Anchorage and demanding payment by close of business in New York.

42.     In the following days, counsel for BNP delivered a series of ultimatums, asserting that Anchorage was obliged to consummate the contemplated transaction and threatening to initiate legal action if Anchorage did not make payment to BNP immediately. Although counsel for Anchorage assured BNP that they were undertaking a diligent review of the situation and would be in a position to respond to BNP on or before February 25, 2013, BNP filed suit against Anchorage on February 19, 2013, in the Commercial Court of the Queen's Bench Division of the UK's High Court of Justice.  To date, Anchorage has not been served with a copy of BNP's filing in that case.

**FIRST CAUSE OF ACTION**
(For Declaratory Relief)

43.     Each of the foregoing allegations is incorporated herein by reference.

44.     The oral understanding reached between Anchorage and BNP on December 7, 2012 and December 10, 2012 is not a firm, binding, irrevocable agreement by Anchorage to purchase the Notes.  To the contrary, the parties' oral understanding left open significant material terms, including what representations and warranties the parties would make to one another in connection with the contemplated transaction.   Under established industry practice, as confirmed by Anchorage's sending of the draft trade acknowledgment shortly after December 10 and BNP's failure to object that the acknowledgment was unnecessary, the parties were required to negotiate one or more formal, written agreements to consummate the contemplated transaction.

12

45.     At all relevant times, Anchorage was prepared to engage in good-faith negotiation with BNP in an effort to reach agreement on all material terms and to prepare the written documentation necessary to consummate the transaction contemplated by the parties' oral understanding.  As a result of BNP's refusal to engage in negotiations, however, no such agreement has been reached.

46.     Notwithstanding the parties' failure to reach agreement on open material terms and on the formal documentation that would be necessary to consummate the contemplated transaction, BNP has asserted that Anchorage is obliged to close the contemplated transaction.

47.     Accordingly, a real and immediate controversy exists between Anchorage and BNP concerning the parties' rights and obligations with respect to the contemplated transaction. In these circumstances, Anchorage is entitled to a declaration of its rights and obligations.  In particular, Anchorage is entitled to a declaration that:

(i)     the oral understanding reached between Anchorage and BNP on December 7, 2012 and December 10, 2012 does not bind Anchorage to purchase the Notes;

(ii)     because the parties have not reached agreement on open material terms and on the formal documentation that would be necessary to consummate the contemplated transaction, Anchorage is not at this time obliged to purchase the Notes; and

(iii)     in any event, BNP did not perform its obligations under any contemplated transaction prior to the announcement of Anglo Irish's liquidation, a delay which materially frustrated the transaction and rendered void any putative contract between the parties.

13

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that the Court grant the following relief:

(a)     A declaration that (i) the oral understanding reached between Anchorage and BNP on December 7, 2012 and December 10, 2012 does not bind Anchorage to purchase the Notes; (ii) because the parties have not reached agreement on open material terms and on the formal documentation that would be necessary to consummate the contemplated transaction, Anchorage is not at this time obliged to purchase the Notes; and (iii) in any event, BNP did not perform its obligations under any contemplated transaction prior to the announcement of Anglo Irish's liquidation, a delay which materially frustrated the transaction and rendered void any putative contract between the parties.

(b)     Attorneys' fees and costs; and

(c)     Such other relief as this Court deems just and proper.

14

Dated:   March 11, 2013         ROBBINS, RUSSELL, ENGLERT, ORSECK,
         Washington, D.C.        UNTEREINER & SAUBER LLP

                                 By: _____
                                     Lawrence S. Robbins
                                     Kathryn S. Zecca
                                     Ariel N. Lavinbuk
                                     Donald Burke

                                 1801 K Street, N.W.
                                 Washington, D.C.  20006
                                 Tel: (202) 775-4500
                                 Fax: (202) 775-4510
                                 lrobbins@robbinsrussell.com

                                 *and*

                                 Andrew A. Wittenstein
                                 FRIEDMAN & WITTENSTEIN
                                 A Professional Corporation
                                 600 Lexington Avenue
                                 New York, NY  10022
                                 Tel:  (212) 750-8700
                                 Fax:  (212) 223-8391
                                 awittenstein@friedmanwittenstein.com

                                 *Attorneys for Plaintiff*

15

Case 1:13-cv-02731-RJS   Document 1   Filed 04/24/13   Page 24 of 42

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------- X

ANCHORAGE CAPITAL GROUP, L.L.C.          :          Index No. 650851/13

                  Plaintiff,          :

   - against -          :

BNP PARIBAS SA,          :

                Defendant.          :

-------------------------------------------------------- X

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK     )
                         )  ss.:
COUNTY OF NEW YORK  )

        PATRICIA N. TAKEMOTO, being duly sworn, deposes and says:

    1.     That she is over eighteen years of age and not a party to this action.

    2.     That on the 14th day of March, 2013, she served a true and correct

copy of the Summons, Complaint and Notice of Commencement of Action Subject to

Mandatory Electronic Filing upon defendant by depositing the same, securely wrapped in a

postage-paid envelope addressed to BNP Paribas SA, 16 Blvd. des Italiens, Paris, France

75009, via Registered Mail, Return Receipt Requested, at the United States Post Office,

Franklin Delano Roosevelt Station, 909 Third Avenue, New York, New York 10022.  The

documents were delivered to the defendant on March 25, 2013.

Patricia N. Takemoto

Sworn to before me this
2nd day of April, 2013

Notary Public

ELAINE L. BRITTON
Notary Public, State of New York
No. 02BR6069749
Qualified in Westchester County
My Commission Expires 02 / 11 / 20 14

# EXHIBIT B

Case 1:13-cv-02731-RJS   Document 1   Filed 04/24/13   Page 26 of 42

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------- X

ANCHORAGE CAPITAL GROUP, L.L.C.

                Plaintiff,

    - against -

BNP PARIBAS SA,

                Defendant.

------------------------------------------------------------------- X

Index No. 650851/13

**AMENDED COMPLAINT**

Plaintiff Anchorage Capital Group, L.L.C. ("Anchorage"), through its attorneys, for its Complaint against Defendant BNP Paribas SA ("BNP") states as follows:

## SUMMARY OF THE ACTION

1.      This action arises from BNP's attempt to force Anchorage to close a transaction that it never agreed to close—and one that, because of BNP's protracted and inexcusable delay, now cannot close on the terms contemplated by the parties.

2.      In early December 2012, Anchorage and BNP discussed a proposed sale of $95 million in face value of subordinated private placement notes ("the Notes") issued by Anglo Irish Bank Corporation PLC ("Anglo Irish"), an Irish commercial bank that was nationalized in 2009. Over the course of multiple telephone calls, the parties reached an understanding with respect to the price Anchorage was willing to pay BNP for the Notes. The parties did not, however, reach agreement on other material terms, including what representations and warranties the parties would make to one another in connection with the contemplated purchase.

3.      Almost immediately after these telephone calls, Anchorage sought to negotiate a formal written agreement. Such documentation is customary in the industry. Accordingly, Anchorage sent BNP a draft trade acknowledgment that contained

representations and warranties that each party would need to make prior to closing. BNP did not dispute the need to negotiate and execute this further documentation. Indeed, BNP assured Anchorage that it would circulate the proposed documentation to the appropriate BNP departments and would reply in due course. But rather than negotiate the outstanding terms of the transaction and complete the necessary documentation, BNP began a pattern of delay.

4.      Although private-placement note transactions typically close in a matter of weeks, BNP made *no* substantive communications regarding the transaction for almost a month. When BNP finally broke its silence, it explained for the first time that it could not get the Notes from their current owner because the Notes had been destroyed months earlier in Hurricane Sandy. BNP provided no timeline for when it would be prepared to proceed with the contemplated transaction.

5.      As the weeks stretched on, Anchorage continued to press BNP to proceed with the contemplated transaction and to provide comments on the draft trade acknowledgment that Anchorage had sent BNP. But BNP continued to delay. On February 5, 2013, BNP advised that it was still awaiting re-issuance of the destroyed Notes and that it could not provide an "ETA" with respect to that process. That same day, during a telephone conversation with Anchorage personnel, BNP's trader explained that he was reluctant to expedite the closing process because he was due to be paid a bonus in two weeks and did not wish to raise Anchorage's concerns with his superiors before he was paid.

6.      In the early morning hours of February 7, 2013, the Irish parliament passed emergency legislation to liquidate Anglo Irish, legislation that rendered the Notes virtually worthless. Thus, as a consequence of BNP's delay in pursuing the transaction, Anchorage

was deprived of any opportunity to sell the Notes to another purchaser—an option Anchorage had contemplated at the time of the parties' initial negotiations and again during the intervening months.

7.      Immediately following the announcement of Anglo Irish's liquidation, BNP's behavior abruptly turned.  Whereas BNP previously had maintained that it was unable to provide any timeline for closing the transaction, on the day that Anglo Irish's liquidation was announced BNP informed Anchorage that it had had made "progress" with its upstream seller.  Later that week BNP proclaimed that it had suddenly found a way to close the transaction in but a single day.

8.      Because of BNP's delay, it is now far from clear how the negotiations necessary to consummate the contemplated transaction could have any realistic chance of success.  In the draft trade acknowledgment that Anchorage sent to BNP following the parties' telephone conversations about price, Anchorage requested from BNP a representation that as of the time of settlement "[t]here are no . . . events which . . . would be defaults pursuant to the Note Purchase Agreement" that governs the Notes.  Under the terms of the Note Purchase Agreement, the appointment of a liquidator for Anglo Irish constitutes a default, and so BNP cannot now make the representation that Anchorage requested nearly two months before the liquidator was appointed.

9.      In any case, BNP never negotiated the outstanding terms and written documentation that, as a matter of industry practice, would be required to consummate the contemplated transaction—documentation that Anchorage had said was required and which BNP had never stated was unnecessary.  Instead, BNP issued a series of ultimatums in which it threatened to initiate legal action if Anchorage did not immediately pay BNP for the

Notes.  Ultimately, BNP filed suit against Anchorage in the United Kingdom on February 19, 2013.  In its filing, BNP omitted to inform the London court of the critical fact that the notes had become virtually worthless before BNP had tendered performance.

10.     Because the parties have not reached agreement on open material terms and on the formal documentation that would be necessary to consummate the contemplated transaction, Anchorage is not under any obligation to close the transaction and purchase the Notes at this time.  Nonetheless, BNP continues to assert that Anchorage is obliged to purchase the Notes and pay BNP immediately.

11.     Accordingly, in light of the real and immediate controversy between Anchorage and BNP, Anchorage seeks a declaration (i) that the parties' oral understanding does not bind Anchorage to purchase the Notes; (ii) that because the parties have not reached agreement on open material terms and on the formal documentation that would be necessary to consummate the contemplated transaction, Anchorage is not at this time obliged to purchase the Notes; and (iii) that in any event, BNP did not tender performance of its obligations under any contemplated transaction prior to the announcement of Anglo Irish's liquidation, a delay which materially frustrated the transaction and rendered void any putative contract between the parties.  In addition, Anchorage seeks damages arising from BNP's failure to negotiate in good faith toward the consummation of the contemplated transaction.

12.     In the alternative, if the parties' oral understanding did constitute a binding contract to purchase the Notes, BNP breached that contract by failing to deliver the Notes to Anchorage within a reasonable time.  Because BNP failed to deliver the notes before they were rendered virtually worthless by the Irish government's decision to liquidate Anglo

Irish, Anchorage has suffered substantial damages as a direct, natural, and proximate result of BNP's breach of contract.

## PARTIES

13.     Plaintiff Anchorage Capital Group, L.L.C. is a Delaware limited liability company with its principal place of business at 610 Broadway, 6th Floor, New York, New York.

14.     Upon information and belief, Defendant BNP Paribas SA is a French *société anonyme* with its principal place of business in Paris, France.

## JURISDICTION AND VENUE

15.     This Court has original jurisdiction over this action pursuant to CPLR §§ 301, 302, and 3001.  BNP has offices and regularly transacts business within the State, and it participated in negotiations and other activities within the State that led to the contemplated transaction that gave rise to Anchorage's claim for declaratory relief in this complaint.

16.     Venue is proper in this Court pursuant to CPLR § 503(a).

## BACKGROUND

17.     In mid-November 2012, BNP asked Anchorage if it was interested in purchasing some portion of the Notes.  BNP's inquiry was referred to a New-York based Anchorage trader, who took the lead in negotiating a possible transaction.  Over the next few weeks, Anchorage and BNP had a series of communications in which BNP conveyed to Anchorage information regarding the Notes and the parties discussed the volume of Notes that Anchorage might purchase and at what price.

5

18.     Among the information conveyed by BNP to Anchorage was that although Anglo Irish had been nationalized by the government of Ireland in January 2009, Anglo Irish had not missed any payments due under the Notes.

19.     BNP further explained to Anchorage that the Notes were embodied in physical certificates, and that, pursuant to the Note Purchase Agreement, transfer of the Notes could be accomplished only by re-registering those certificates with Anglo Irish itself. Anchorage also understood that BNP did not yet own the Notes it was seeking to sell; rather, the Notes were owned by an "upstream" seller, Fir Tree Capital ("Fir Tree"), another New-York-based firm.  In effect, BNP was serving as a broker between a seller and a purchaser that were both located in New York.  Although Anchorage was aware that Fir Tree owned the Notes, Anchorage did not have any reason to suspect that Fir Tree lacked physical control of the certificates—a fact that would not emerge until several weeks later.

20.     During Anchorage's negotiations and discussions with BNP, BNP also emphasized that, pursuant to the Note Purchase Agreement, the Notes are governed by New York law.   This fact was important to Anchorage because, following Anglo Irish's nationalization in 2009, Anglo Irish had forced holders of other notes governed by Irish law to exchange those notes for less than face value, but had not done the same with respect to notes governed by New York law.

21.     Consistent with the Notes being governed by New York law, the Note Purchase Agreement provided that any legal action or proceeding arising out of the Note Purchase Agreement or the Notes themselves may be brought in the New York state courts or in the United States District Court for the Southern District of New York.  Additionally,

6

all payments due under the Notes were to be denominated in United States Dollars and made in New York City.

22.     The connection between New York and the contemplated transaction is reinforced by the fact that the Notes themselves were and, upon information and belief, still remain in New York.   As BNP would ultimately inform Anchorage, the certificates evidencing the Notes were destroyed in flooding caused by Hurricane Sandy at a Depository Trust Company facility in New York.

23.     While evaluating whether to purchase the Notes, Anchorage investigated the possibility of re-selling the bonds, at a profit, back to Anglo Irish itself, and Anchorage communicated with an Anglo Irish official about this possibility.   Although the official appeared receptive to such a transaction, Anchorage was unable to pursue the matter further because it did not have possession of the Notes.

24.     On December 7, 2012, Anchorage's trader, acting from New York, reached an oral understanding with BNP's trader that Anchorage would be willing to purchase $50 million in face value of the Notes, at a price of 62.5 cents on the dollar.   The parties also reached an understanding that Anchorage would have an option on an additional $45 million in face value until the following Monday, December 10, 2012.

25.     On December 10, 2012, an Anchorage trader based in London informed BNP that Anchorage would be willing to purchase the additional $45 million in face value of the Notes previously negotiated by Anchorage's New-York-based trader.   Thus, between December 7 and December 10, the parties reached an oral understanding that Anchorage would be willing to purchase an aggregate face value of $95 million of the Notes at a price of 62.5 cents on the dollar.

7

26.     Upon information and belief, during the course of negotiations regarding the Notes, Anchorage's trader expressly told BNP's trader that any proposed transaction was subject to documentation.

27.     In any event, it is customary in the industry that any transaction involving a sale of private placement notes would be documented with one or more formal, written agreements between the parties to the sale.  There is no standardized form or structure for such agreements.  Instead, the parties to a sale of private placement notes generally negotiate the required agreements on a case-by-case basis.  Such agreements typically contain a series of representations and warranties by both the seller and the buyer.

28.     In accordance with this industry practice, Anchorage promptly contacted BNP to begin the process of negotiating the documentation necessary to consummate the transaction.  On December 11, 2012, Anchorage sent BNP an email message in which it outlined potential options for settlement of the transaction and explained that, to complete the transaction, it would need confirmation documents and transfer documentation as outlined in the Note Purchase Agreement.

29.     BNP did not respond to Anchorage's email on December 11.  The next day, December 12, 2012, Anchorage sent another email message requesting a response.  Later that day, BNP responded via email.  It explained that the Notes took the form of physical certificates and that it would take some time to re-register the Notes from Fir Tree to BNP. BNP estimated that the process would take four weeks.  At no point in its email did BNP suggest that further documentation would not be required to consummate the contemplated transaction.

30.     On December 14, 2012, Anchorage sent BNP a draft trade acknowledgment and requested that BNP provide comments on the draft.  Among the terms included in the draft trade acknowledgment was a representation by BNP that, as of the time of settlement, "[t]here are no undeferred, or unwaived defaults, or events which with the giving of notice or passage of time or both would be defaults pursuant to the Note Purchase Agreement."  In addition, the draft trade acknowledgment included a term (to which BNP has never objected) providing that the parties' agreement would be governed by New York law.

31.     On December 17, 2012, BNP responded to Anchorage's email message, stating that Anchorage's communication had been passed on to BNP's compliance/legal department and that BNP would reply in due course.  Once again, BNP's email did not suggest that further documentation was unnecessary to consummate the contemplated transaction.

32.     But BNP never replied with comments on Anchorage's proposed trade acknowledgment.  On January 4, 2013, Anchorage again contacted BNP, asking for a status update.  Later that day, BNP told Anchorage that it was still awaiting re-registration from Fir Tree and explained, for the first time, that the delay in this process was because the physical certificates for the Notes had been destroyed several months earlier by flooding during Hurricane Sandy.  Anchorage stated that, while waiting for Anglo Irish to issue new certificates to replace the destroyed ones, the parties should negotiate the terms of the documentation necessary to consummate the contemplated transaction.  Anchorage also asked that BNP indicate when it would provide comments on the draft trade acknowledgment that had been proposed to BNP almost one month before.  BNP did not

respond to this question, nor did it suggest in any way that further documentation was unnecessary to consummate the contemplated transaction.

33.     Anchorage sought further status updates from BNP on January 15 and January 16, 2013, but BNP did not provide comments on the draft trade acknowledgment.

34.     In mid-January 2013, Anchorage spoke by telephone with Fir Tree personnel in New York about the possibility of Anchorage stepping into Fir Tree's shoes in litigation that Fir Tree had brought against Anglo Irish.  Spurred by this development, Anchorage again considered the possibility of selling the Notes back to Anglo Irish at a profit. But again Anchorage was unable to pursue such a strategy because it did not have possession of the Notes.

35.     On February 4, 2013, Anchorage sought yet another status update from BNP. BNP responded on February 5, stating that BNP was *still* waiting for the physical certificates to be reissued by Anglo Irish and that there was no "ETA" on completion of the process. Once again, BNP did not suggest in any way that further documentation was unnecessary to consummate the contemplated transaction.

36.     Also on February 5, Anchorage's trader and two of its analysts contacted BNP's trader to express their frustration with the delay in consummating the contemplated transaction.  BNP's trader asked to delay the conversation, explaining that he was due to be paid a bonus in two weeks—a bonus he said he did not want to jeopardize by raising Anchorage's concerns with his superiors.  Anchorage stated that this was unacceptable, and BNP's trader ultimately proposed that the parties use an escrow arrangement to consummate the transaction.   Anchorage rejected that option because it would not have allowed Anchorage to control the physical certificates at settlement.

37.     Control of the physical certificates was important to Anchorage for several reasons. *First*, it would assure that, when Anchorage paid for the Notes, it would indeed have title to them. *Second*, the ability to produce the physical certificates might be necessary to collect on the Notes in the event of a coercive restructuring of the Anglo Irish debt. *Third*, as a practical matter, Anchorage would need control over the physical certificates if it were to pursue the option of selling the Notes to another purchaser, including the option of selling the Notes back to Anglo Irish itself.

38.     During the evening of February 6, 2013, the Irish parliament held a late-night parliamentary session to consider emergency legislation to liquidate Anglo Irish, which liquidation was proposed by the Irish government as part of negotiations with the European Central Bank. The legislation was passed in the early morning hours of February 7, 2013. Under the terms of the legislation, the board of Anglo Irish was immediately discharged and replaced by the accounting firm KPMG, which would serve as liquidator for the company.

39.     As a result of the Irish government's liquidation plan, the Notes are now virtually worthless. BNP's inexcusable delay in consummating the contemplated transaction has therefore deprived Anchorage of any opportunity to re-sell the Notes at a profit, including the option, which Anchorage had specifically contemplated, of re-selling the Notes back to Anglo Irish.

40.     The appointment of a liquidator for Anglo Irish constitutes a default under the Note Purchase Agreements. As a consequence, if the contemplated transaction were to be consummated, BNP would be unable to make the representation proposed in Anchorage's draft trade acknowledgment that, at the time of settlement, "[t]here are no undeferred, or

unwaived defaults, or events which with the giving of notice or passage of time or both would be defaults pursuant to the Note Purchase Agreement."

41.     Later on February 7, 2013, just hours after the announcement of Anglo Irish's liquidation, BNP emailed Anchorage and reported that—notwithstanding BNP's inability to provide even an estimated ETA just a few days before—"[w]e have had some progress from our Seller." In its email, BNP asked Anchorage to provide its full legal name for listing on the certificates. On February 11, 2013, BNP again emailed Anchorage, stating that it was in discussions with Anglo Irish to reduce the period of re-registration to a single day.

42.     On February 14, 2013, BNP sent an email to Anchorage stating that it had been in contact with Anglo Irish and that it expected to be able to settle the contemplated transaction and would require payment in the next few days. Later that same day, BNP sent an email to Anchorage, attaching new certificates that reflected transfer of the Notes to the names of funds managed by Anchorage and demanding payment by close of business in New York.

43.     In the following days, counsel for BNP delivered a series of ultimatums, asserting that Anchorage was obliged to consummate the contemplated transaction and threatening to initiate legal action if Anchorage did not make payment to BNP immediately. Although counsel for Anchorage assured BNP that they were undertaking a diligent review of the situation and would be in a position to respond to BNP on or before February 25, 2013, BNP filed suit against Anchorage on February 19, 2013, in the Commercial Court of the Queen's Bench Division of the UK's High Court of Justice.

44. In its February 19 filing, BNP omitted to inform the London court of the critical fact that, as a consequence of BNP's own inexcusable delay, the Notes had become virtually worthless before BNP tendered performance.

45. Anchorage was not served with a copy of BNP's original UK claim. On March 13, 2013, however, BNP served an amended version of its UK claim on Anchorage Capital Europe LLP, a London-based affiliate of Anchorage. In an apparent attempt to secure jurisdiction in the London court, the claim had been amended to include Anchorage Capital Europe LLP as a defendant. The "[b]rief details of claim" served on Anchorage Capital Europe LLP do not suggest any reason that BNP might possess a cause of action against Anchorage Capital Europe LLP.

### FIRST CAUSE OF ACTION
(For Declaratory Relief)

46. Each of the foregoing allegations is incorporated herein by reference.

47. The oral understanding reached between Anchorage and BNP on December 7, 2012 and December 10, 2012 is not a firm, binding, irrevocable agreement by Anchorage to purchase the Notes. To the contrary, the parties' oral understanding left open significant material terms, including what representations and warranties the parties would make to one another in connection with the contemplated transaction. Under established industry practice, as confirmed by Anchorage's sending of the draft trade acknowledgment shortly after December 10 and BNP's failure to object that the acknowledgment was unnecessary, the parties were required to negotiate one or more formal, written agreements to consummate the contemplated transaction.

48. At all relevant times, Anchorage was prepared to engage in good-faith negotiation with BNP in an effort to reach agreement on all material terms and to prepare

13

the written documentation necessary to consummate the transaction contemplated by the parties' oral understanding. As a result of BNP's refusal to engage in negotiations, however, no such agreement has been reached.

49.     Notwithstanding the parties' failure to reach agreement on open material terms and on the formal documentation that would be necessary to consummate the contemplated transaction, BNP has asserted that Anchorage is obliged to close the contemplated transaction.

50.     Accordingly, a real and immediate controversy exists between Anchorage and BNP concerning the parties' rights and obligations with respect to the contemplated transaction. In these circumstances, Anchorage is entitled to a declaration of its rights and obligations. In particular, Anchorage is entitled to a declaration that:

(i)     the oral understanding reached between Anchorage and BNP on December 7, 2012 and December 10, 2012 does not bind Anchorage to purchase the Notes;

(ii)     because the parties have not reached agreement on open material terms and on the formal documentation that would be necessary to consummate the contemplated transaction, Anchorage is not at this time obliged to purchase the Notes; and

(iii)     in any event, BNP did not tender performance of its obligations under any contemplated transaction prior to the announcement of Anglo Irish's liquidation, a delay which materially frustrated the transaction and rendered void any putative contract between the parties.

## SECOND CAUSE OF ACTION
(Breach of obligation to negotiate in good faith)

51. Each of the foregoing allegations is incorporated herein by reference.

14

52. Under the oral understanding reached between Anchorage and BNP on December 7, 2012 and December 10, 2012, the parties were obligated to negotiate with one another in good faith toward the consummation of the transaction contemplated by the parties' oral understanding.

53. Although Anchorage was prepared to engage in good-faith negotiation with BNP in an effort to reach agreement on all material terms and to prepare the written documentation necessary to consummate the contemplated transaction, BNP failed to negotiate in good faith toward the consummation of the contemplated transaction.

54. As a direct, natural, and proximate result of BNP's breach of its obligation to negotiate in good faith, Anchorage has suffered significant damages.

## THIRD CAUSE OF ACTION
### (Breach of contract)

55. The allegations contained in paragraphs 1 through 45 are incorporated herein by reference.

56. In the alternative, if the oral understanding reached between Anchorage and BNP on December 7, 2012 and December 10, 2012 constitutes a binding contract under which Anchorage committed to purchase and BNP committed to sell the Notes, then BNP breached the parties' contract by failing to deliver the Notes to Anchorage within a reasonable time.

57. In addition, BNP breached the obligation of good faith and fair dealing that is an implied term of all contracts under New York law by failing to deliver the Notes to Anchorage within a reasonable time and by failing to disclose to Anchorage, prior to the announcement of Anglo Irish's liquidation, that it was in fact able to deliver the Notes to Anchorage within a matter of days.

15

58. Anchorage has performed all of its obligations under the parties' contract or those obligations have been excused.

59. Any conditions precedent to BNP's contractual liability have occurred or have been excused.

60. As a direct, natural, and proximate result of BNP's breach, Anchorage has suffered significant damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court grant the following relief:

(a)     On the First Cause of Action, a declaration that (i) the oral understanding reached between Anchorage and BNP on December 7, 2012 and December 10, 2012 does not bind Anchorage to purchase the Notes; (ii) because the parties have not reached agreement on open material terms and on the formal documentation that would be necessary to consummate the contemplated transaction, Anchorage is not at this time obliged to purchase the Notes; and (iii) in any event, BNP did not tender performance of its obligations under any contemplated transaction prior to the announcement of Anglo Irish's liquidation, a delay which materially frustrated the transaction and rendered void any putative contract between the parties;

(b)     On the Second Cause of Action or, alternatively, on the Third Cause of Action, damages in an amount to be proven at trial;

(c)     Attorneys' fees and costs; and

(d)     Such other relief as this Court deems just and proper.

16

Dated: April 4, 2013                ROBBINS, RUSSELL, ENGLERT, ORSECK,
       Washington, D.C.             UNTEREINER & SAUBER LLP


By: _____
    Lawrence S. Robbins
    Kathryn S. Zecca
    Ariel N. Lavinbuk
    Donald Burke

1801 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
lrobbins@robbinsrussell.com

*and*

Andrew A. Wittenstein
FRIEDMAN & WITTENSTEIN
A Professional Corporation
600 Lexington Avenue
New York, NY 10022
Tel: (212) 750-8700
Fax: (212) 223-8391
awittenstein@friedmanwittenstein.com

*Attorneys for Plaintiff*

17